## BLODGETT PAPER COMPANY *v.* FARMER.

Where the question of the actual *bonâ fide* intention of parties in any transaction occurring between them is in controversy, whatever is directly calculated to throw light upon their probable motives, or to illustrate their existing relations and the feelings likely to influence their action, is competent for the consideration of the jury.

Twenty years' continuous experience in the manufacture of a particular article, some portion of the time as foreman in the business, is *primâ facie* evidence of superior knowledge in that branch of manufactures.

When a witness is inquired of as to a particular state of facts, and he replies that it has no existence to his knowledge,—his answer is not objectionable, if it appear that he has special means of knowledge on that subject.

The admission of testimony tending to contradict that of a witness for the opposite party in a material point, or which is simply immaterial and not calculated to excite prejudice, is no cause for disturbing a verdict.

TROVER, for seventeen boxes of knives and plates for paper engines. Under the general issue the defendant introduced evidence subject to the plaintiffs' exception, tending to show that the plates and knives were the property of Kennedy & Co., and that the defendant, as deputy sheriff, attached them while in possession of the plaintiffs,

on writs against Kennedy & Co. It appeared that by indentures executed March 16, 1858, the plaintiffs leased their paper-mill, fixtures, and machinery to Kennedy & Co.; that Kennedy & Co. covenanted "to keep all and every part of the property hereby leased, in as good order, condition, and repair as the same is now in;" that the lease was "to be terminated immediately upon a violation by either party hereto of any of the provisions, covenants, or agreements herein contained;" that Kennedy & Co. covenanted "that the lessor may enter to view and make improvements, and expel the lessees if they shall fail to perform any of the provisions and stipulations of this lease;" and that the lessees "shall peaceably and quietly quit and deliver up the premises to the lessor or its attorney at the termination of this lease, in as good order and condition, reasonable and careful usage thereof and unavoidable casualties excepted, as the same now are."

In October, 1858, Kennedy & Co. having failed in business and broken certain covenants of the lease, the plaintiffs took exclusive possession of the mill and contents, including said knives and plates, and on November 9, 1858, the defendant attached the knives and plates as property of Kennedy & Co., then being in the mill and in the possession of the plaintiffs, and carried them away. Plates and knives for paper engines are parts of paper engines, which wear out in five or six years and have to be renewed. The knives and plates attached by the defendant were bought by Kennedy & Co., and placed in the mill while occupied by them, for the purpose of being put into the plaintiffs' engines instead of the old ones then in use, but they had not been so applied, or taken out of the boxes in which they were received, when the defendant attached them. The defendant's evidence tended to show that they were bought and deposited in the mill to be used when they might be needed; that they were not bought for immediate use, but to be used as occasion might require;

Blodgett Paper Company *v.* Farmer.

that they were what was called spare stock; and that the condition of the old knives and plates was such when Kennedy & Co. failed, that the new ones were not needed for immediate use. But the plaintiffs' evidence tended to show that the condition of the old ones was such that the new ones were needed for immediate use. The court instructed the jury, as requested by the plaintiffs, that if the knives and plates were delivered by Kennedy & Co. to the plaintiffs, and received by the plaintiffs as part of the plaintiffs' engines and as property of the plaintiffs, in good faith as to the creditors of Kennedy & Co.; or if Kennedy & Co. allowed the plaintiffs to take or hold possession of the knives and plates as part of the plaintiffs' engines, and as property of the plaintiffs—Kennedy & Co. assenting to such possession—with like good faith, the plaintiffs were entitled to recover. The plaintiffs claimed to recover upon the ground of possession, and also the title authorized by the instructions to be found by the jury, and the only questions submitted to the jury were included in the instructions. Subject to the plaintiffs' exception, the defendant introduced evidence tending to show that Kennedy & Co., while in possession, had repaired the mill and other machinery than the engines, knives, and plates; that the mill and other machinery were in better condition when the plaintiffs took possession than when Kennedy & Co. took possession; and that a note given by Kennedy & Co. to the plaintiffs, for a large amount of paper supposed to be at Chicago, upon which note the plaintiffs had recovered judgment, was given for a larger amount than the actual value of the paper at Chicago.

The defendant introduced the deposition of one Frost, who testified that he had been engaged in paper manufacturing twenty-two years, and was employed by Kennedy & Co. as foreman of the mill from July 26, 1858, until they failed, and afterward a short time by the sheriff in manufacturing the stock on hand. The following questions and

answers in his deposition were read by the defendant, subject to the plaintiffs' exception:

"INT. 4. State whether or not, in your opinion, the mill and machinery were in good running order when Kennedy & Co. leased it.

ANS. It was not.

INT. 5. Describe the condition of the mill and machinery at the time of Kennedy & Co.'s failure.

ANS. It was in fair running order. We were making, at the time of the failure, 5,400 lbs. of paper per day.

INT. 8. What was the condition of the mill and machinery at the time Kennedy & Co. failed, as compared with its condition at the time they leased it?

ANS. The mill was enough better to manufacture from 1,000 to 1,200 lbs. per day more when they failed than it was before. The condition of the mill at the time they failed, was in suitable order to manufacture 5,400 lbs. a day; at the time they leased it, it was not suitable to manufacture paper at all."

The defendant also introduced the deposition of one Selden, who testified that he had run a paper machine thirty-six years, and worked for Kennedy & Co. while they occupied the plaintiffs' mill; that he used the pulp made by the paper engines (for which the knives and plates in question were purchased) in the paper machine on which he worked, and by that means had special knowledge of the condition of the old knives and plates; and that he examined said engines about two weeks before Kennedy & Co. failed. The following question and answer in his deposition were read by the defendant, subject to the plaintiffs' exception:

"INT. 7. State whether or not, when Kennedy & Co. failed, there was any immediate use for new engine bars and bed plates.

ANS. Not to my knowledge."

The knives are sometimes called bars, and the plates are sometimes called bed plates. E. A. Straw, who was president and general agent of the plaintiffs at the time of the lease to Kennedy & Co. and ever since, testified for the plaintiffs as to the condition of the engines, knives and plates when Kennedy & Co. took possession, and when they failed. The defendant read the following question and answer from the deposition of one Duxbury, subject to the plaintiffs' exception:

"INT. 14. State whether or not you ever heard E. A. Straw, of Manchester, or B. F. Martin, of Manchester, say any thing in regard to the condition of the mill at the time Kennedy & Co. took it, or at the time when they left it.

ANS. Frequently, during the time that the mill was repairing up, Mr. Straw and Mr. Martin were in there, and I remember distinctly that when we tore up a portion of the flooring between the engines, over the waste boxes, Mr. Straw saw the condition in which the waste boxes were, being filled up with pulp and dirt, &c., rendering it necessary to put up new waste boxes between some of the engines; and all of them had to be thoroughly cleaned out from one end of the mill to the other. Mr. Straw remarked about the condition in which the mill was; he seemed to approve of all that was being done, and thought it was necessary. I cannot recollect the particular remarks that were made."

*Clark & Smith*, and *I. A. Eastman*, for the plaintiffs.

*Morrison & Stanley*, for the defendant.

FOWLER, J. The only questions submitted to the jury, as found by the case, were, whether the knives and plates in controversy were delivered to the plaintiffs by Kennedy & Co., and received by the plaintiffs, in good faith to the creditors of Kennedy & Co., as part of the plaintiffs' engines and as their property, or whether Kennedy & Co., in

good faith toward their creditors, assented and allowed the plaintiffs to take or hold possession of the knives and plates as their own property and part of their engines.

It appears from the case that the knives and plates were in the actual custody and possession of the plaintiffs, and were taken therefrom by the defendant, so that the only questions really submitted to the jury must have been, whether, in good faith, Kennedy & Co. intended to deliver, and the plaintiffs understood they were receiving, the knives and plates as their own and part of their engines, or whether Kennedy & Co., in like good faith, intended to allow and assent to the plaintiffs' taking and retaining possession of the knives and plates as belonging to them and part of their engines. These questions, for the want of, or notwithstanding the direct testimony of the parties to the transactions, must have been peculiarly matters of probability, to be determined by the conduct and acts of the parties and all the surrounding circumstances. Every thing connected with the transactions between the parties calculated to throw any light upon the probable motives by which their conduct might be governed; every thing tending to show the relations existing between them, and the feelings naturally likely to influence their action, in the absence of, or in conflict with the direct testimony on the subject, would be competent on the question of actual *bonâ fide* intention. If Kennedy & Co., while in the occupation of the premises, had improved their comparative condition generally, aside from the particular machinery for renewing which the articles in question were designed, they would be far less likely designedly to appropriate and set apart and deliver, or assent that the plaintiffs should retain, those articles to renew the machinery to which they were adapted, than if no such general comparative improvement had taken place. So, too, if Kennedy & Co. had been imposed upon and deceived by the plaintiffs as to the quantity or value of the paper at Chicago, for which

they had given their notes, they would be far less likely to be disposed to yield to the plaintiffs any advantage in the matter of the repair or renewal of their engines, than if no such occasion for complaint had arisen.

We are of opinion, therefore, that the evidence in relation to the comparatively improved general condition of the mill and machinery, other than that for which the knives and plates were designed, as well as that relating to the deficiency of paper purchased and paid for at Chicago, was properly admitted.

The case finds that Frost had been engaged in the manufacture of paper for twenty-two years, and was employed as foreman to superintend the business of Kennedy & Co. We think there can be no doubt that he must be regarded as *primâ facie* an expert, whose opinion, on all questions of science or skill connected with the business in which he had been so long engaged, was competent to be weighed by the jury. The admissibility of the subject matter of his testimony has already been considered. Gr. Ev., sec. 440, notes and authorities.

The question proposed to Selden, and his answer thereto, do not seem to us open to the slightest objection. He had the best possible means of knowledge on the subject as to which he was inquired of; and his reply was simply, that he was not aware—had no knowledge—that there existed any occasion for new engine bars and bed plates. The interrogatory called for his knowledge, and, if truthful, he was bound to give it, if he had any. He simply said he had none. This does not seem to us to be giving his opinion in any way. It is merely the statement of a negative fact.

The testimony of Duxbury was either competent as tending to contradict that of Straw on a material point, or it was simply immaterial so far as Straw's testimony was concerned, and not calculated to excite prejudice, and therefore its admission not a cause for disturbing the verdict.

If Straw had testified, as seems probable, that the portions of the mill to which the testimony of Duxbury related were in good condition and repair when Kennedy & Co. took possession, then that testimony had a tendency to contradict him. If he had not so testified, then the testimony of Duxbury, unless competent, upon the general grounds before adverted to, as bearing upon the comparative condition of the mill at the time Kennedy & Co. took possession and when they left it, was entirely immaterial and irrelevant; but, not being calculated to prejudice the plaintiffs in any way that we can perceive, its improper admission would furnish no ground for setting aside the verdict. *Winkley* v. *Foye*, 28 N. H. 519; S. C. 33 N. H. 171; *Center* v. *Center*, 38 N. H. 318.

The objections taken upon the trial must therefore be all overruled, and judgment be rendered upon the verdict.